Tressa A. **THOMPTO**, Plaintiff,

v.

**COBORN'S INCORPORATED,**
Defendant.

No. C 93–3046.

United States District Court,
N.D. Iowa,
Central Division.

Nov. 23, 1994.

1100

Gary E. Leonard of Alderson, Ondov, Leonard, Sween & Rizzi, P.A., Austin, MN, for plaintiff Tressa Thompto.

Robert S. Kinsey, III, of Brown, Kinsey & Funkhouser, Mason City, IA, for defendant Coborn's Inc.

MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## TABLE OF CONTENTS

I. PROCEDURAL BACKGROUND .......................................... 1103
II. STANDARDS FOR SUMMARY JUDGMENT ............................. 1104
III. FINDINGS OF FACT ................................................. 1106
 A. Undisputed Facts ............................................. 1106
 B. Disputed Facts .............................................. 1107
IV. LEGAL ANALYSIS .................................................. 1108
 A. Tort Claims And Iowa Code Ch. 216 ......................... 1108
 B. The Claim Of Wrongful Discharge In Violation Of Public Policy ..... 1111
 1. Public Policy And Inquiries About Insurance Benefits ........... 1114
 2. Public Policy And Threats To Consult An Attorney ............... 1116
 C. The Intentional Infliction Of Emotional Distress Claim ............. 1122
 1. Elements Of The Tort ....................................... 1122
 2. The Outrageousness Of Defendant's Conduct .................... 1122
 3. Sufficiency Of Plaintiff's Emotional Distress .................... 1124
 D. The Defamation Claim .......................................... 1124
 1. Defamation And Defamation "Per Se" .......................... 1124
 2. Qualified Privilege ........................................... 1125
V. CONCLUSION ...................................................... 1129

---

BENNETT, District Judge.

Defendant employer has moved for summary judgment on three of the seven counts in a former employee's lawsuit arising out of the termination of the employee's at-will employment. First, the employer has moved for summary judgment on the former employee's claim of wrongful or retaliatory discharge in violation of public policy. The former employee asks this court to extend the public policy exception to at-will employment to protect her from discharge allegedly

based on her inquiries about cancer insurance coverage and requests for an explanation of why that coverage was not available, and her threats to consult a lawyer to assist her in obtaining coverage or an explanation. The employer seeks summary judgment on this claim on the ground that, even assuming the former employee was terminated for the reasons she suggests and not for poor performance as asserted by the employer, no clearly articulated public policy of this state is implicated by the former employee's termination. Second, the employer seeks summary judgment on the former employee's claim of intentional infliction of emotional distress on the ground that no conduct alleged is sufficiently outrageous as a matter of law to support the claim. Third, the employer seeks summary judgment on the former employee's claim of defamation, asserting a qualified privilege to make limited publication of the negative evaluations of the former employee's performance upon which the defamation claim is based. The parties have also agreed to dismissal of all or parts of other counts in the former employee's complaint.

## I. PROCEDURAL BACKGROUND

Plaintiff Tressa A. Thompto filed her complaint against defendant Coborn's Incorporated on June 28, 1993, alleging age and sex discrimination, breach of contract, and tortious conduct arising out of her termination as deli manager of the Cash Wise Store in Mason City, Iowa, which is owned and operated by Coborn's. Thompto's complaint is in seven counts. Count I alleges sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a). Count IV alleges failure to provide insurance benefits in violation of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.* The remaining claims are pendant state-law claims. Count II alleges age and sex discrimination in violation of the Iowa Civil Rights Act, Iowa Code § 601A.6(1)(a) (now Iowa Code § 216.6(1)(a)). Count III alleges breach of contract for failure to provide cancer insurance. Count V alleges common-law wrongful or retaliatory discharge for inquiring about cancer insurance coverage and requesting an explanation

for why the coverage was not available, and for threatening to consult a lawyer to obtain such coverage or an explanation. Count VI alleges common-law defamation as the result of alleged publication of unfavorable employment evaluations and false grounds for termination. Count VII alleges common-law intentional infliction of emotional distress as the result of all of the conduct alleged in the other counts of the complaint.

Coborn's answered the complaint on October 1, 1993. On September 23, 1994, Coborn's filed its first amended answer to the complaint to add as an affirmative defense to all complaints Thompto's failure to mitigate damages, and to add qualified privilege as an affirmative defense to the defamation claim in Count VI. Apparently because the parties did not contemplate any amendments in their scheduling report filed October 27, 1993, no deadline for filing of amendments was established. However, because the amendment here follows by more than twenty days the filing of the original answer, Coborn's requires leave of the court to file the amendment. That leave is hereby granted.

On October 11, 1994, Coborn's moved for partial summary judgment in its favor on three of the seven counts of the complaint. First, Coborn's argues that it is entitled to summary judgment on Thompto's claim of wrongful or retaliatory discharge, Count V, on the ground that the Iowa Supreme Court has never recognized a public policy exception protecting an at-will employee from termination on the basis of that employee's inquiries concerning insurance coverage. Thompto resists summary judgment on this count on the ground that there is a genuine issue of material fact as to whether or not she was terminated for discriminatory or retaliatory reasons rather than for poor performance as alleged by Coborn's, and on the ground that this court should recognize a public policy exception to termination of an at-will employee protecting her from termination for inquiring about cancer insurance coverage and for threatening to consult a lawyer to obtain that coverage or an explanation of the lack of coverage.

Coborn's has also moved for summary judgment on Count VI of Thompto's complaint on the ground that it had a qualified privilege to make the allegedly defamatory statements, in negative employee evaluations of Thompto and explanations of Thompto's termination, to investigatory bodies and Coborn's employees and that Thompto cannot show that those statements were made with actual malice. Thompto counters that there is a genuine issue of material fact as to the truth or falsity of the statements Coborn's made and whether they were made with actual malice. Thompto also argues that Coborn's did not make the allegedly defamatory statements in "good faith" and therefore cannot claim any qualified privilege.

Coborn's has also moved for summary judgment on Thompto's claim of intentional infliction of emotional distress, Count VII, on the ground that none of the conduct Thompto complains of, even if it were true, which Coborn's disputes, rises to the level of outrageousness necessary to support such a claim. Thompto argues that there is a genuine issue of material fact as to whether or not Coborn's conduct was sufficiently outrageous to support her tort claim.

Finally, the parties have agreed to disposition or partial disposition of some of the counts of Thompto's complaint and ask this court to enter an order confirming these dispositions. First, the parties have agreed to dismissal of Count IV, the ERISA claim. Second, the parties have agreed that Counts I (Title VII) and II (Iowa Code § 216.6) shall be amended to delete any age discrimination claims, and that Count II shall be withdrawn from jury consideration and will instead be tried to the bench. Next, the parties have agreed that Count II shall be further amended to delete any damages claims for "inconvenience" and "loss of enjoyment of life." The parties have also agreed that Counts III, V, VI, and VII of the complaint shall be amended to eliminate any claims for "back pay," "inconvenience," and "loss of enjoyment of life," and to eliminate any claim for recovery of attorney fees. The court confirms these dispositions or partial dispositions, and turns to consideration of Coborn's motion for partial summary judgment on Counts V, VI, and VII. Before addressing the merits of Coborn's summary judgment motion, the court examines the appropriate standards for summary judgment.

## II. STANDARDS FOR SUMMARY JUDGMENT

The Eighth Circuit recognizes "that summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries." *Wabun–Inini v. Sessions,* 900 F.2d 1234, 1238 (8th Cir.1990). On the other hand, the Federal Rules of Civil Procedure have authorized for nearly 60 years "motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Thus, the "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Wabun–Inini,* 900 F.2d at 1238 (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986)); *Hartnagel v. Norman,* 953 F.2d 394, 396 (8th Cir.1992).

The standard for granting summary judgment is well established. *Rule 56* of the Federal Rules of Civil Procedure states in pertinent part:

Rule 56. Summary Judgment

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

*Fed.R.Civ.P.* 56(b) & (c) (emphasis added); *see also Celotex Corp. v. Catrett,* 477 U.S.

317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Munz v. Michael,* 28 F.3d 795, 798 (8th Cir.1994); *Roth v. U.S.S. Great Lakes Fleet, Inc.,* 25 F.3d 707, 708 (8th Cir.1994); *Cole v. Bone,* 993 F.2d 1328, 1331 (8th Cir.1993); *Woodsmith Publishing Co. v. Meredith Corp.,* 904 F.2d 1244, 1247 (8th Cir.1990); *Wabun–Inini,* 900 F.2d at 1238 (citing *Fed.R.Civ.P.* 56(c)).[1] A court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party, here Thompto, and give Thompto the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); *Munz v. Michael,* 28 F.3d 795, 796 (8th Cir. 1994); *Allison v. Flexway Trucking, Inc.,* 28 F.3d 64, 66 (8th Cir.1994); *Johnson v. Group Health Plan, Inc.,* 994 F.2d 543, 545 (8th Cir.1993); *Burk v. Beene,* 948 F.2d 489, 492 (8th Cir.1991); *Coday v. City of Springfield, Mo.,* 939 F.2d 666, 667 (8th Cir.1991), *cert. denied,* 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 416 (1992).

Procedurally, the moving party, here Coborn's, bears "the initial responsibility of informing the district court of the basis for [its] motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553); *see also Reed v. Woodruff County, Ark.,* 7 F.3d 808, 810 (8th Cir.1993). Coborn's is not required by *Rule* 56 to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.*

"When a moving party has carried its burden under *Rule* 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. Thompto is required under *Rule* 56(e) to go beyond the pleadings, and by affidavits,

or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P.* 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. Although "direct proof is not required to create a jury question, ... to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.'" *Metge v. Baehler,* 762 F.2d 621, 625 (8th Cir.1985) (quoting *Impro Products, Inc. v. Herrick,* 715 F.2d 1267, 1272 (8th Cir.1983), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1282, 79 L.Ed.2d 686 (1984)), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). The necessary proof that Thompto must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Allison v. Flexway Trucking, Inc.,* 28 F.3d 64, 66 (8th Cir.1994).

In *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510, *Celotex,* 477 U.S. at 323–24, 106 S.Ct. at 2553, and *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1356, the Supreme Court established that a summary judgment motion should be interpreted by the trial court to accomplish its purpose of disposing of factually unsupported claims, and the trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990). The trial court, therefore, must "assess the adequacy of the nonmovants' response and whether that showing, on admissible evidence, would be sufficient to carry the burden of proof at trial." *Hartnagel,* 953 F.2d at 396 (citing *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552). If Thompto fails to make a sufficient showing of an essential element of a claim with respect to which she has the burden of proof,

---

1. An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman,* 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). "Only disputes over facts that

might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Hartnagel,* 953 F.2d at 394.

then Coborn's is "entitled to judgment as a matter of law." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552; *Woodsmith,* 904 F.2d at 1247. However, if the court can conclude that a reasonable trier of fact could return a verdict for the nonmovant, then summary judgment should not be granted. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Burk,* 948 F.2d at 492; *Woodsmith,* 904 F.2d at 1247. With these standards in mind, the court turns to consideration of Coborn's motion for partial summary judgment.

## III. FINDINGS OF FACT

### A. Undisputed Facts

The record reveals that the following facts are undisputed. On April 22, 1991, Thompto was hired as the deli department manager for the Mason City Cash Wise Store owned by Coborn's. She was interviewed for the position by the Mason City store manager, Dave Meyer, and Coborn's Deli Supervisor, Bill Landowski. Coborn's had been dissatisfied with the prior deli manager of the Mason City store, and hoped that Thompto's training and experience with McDonald's would help her to turn around the deli's performance. Coborn's set performance targets for the Mason City deli department of 40% gross profits and 30% for labor costs.[2] The performance of the Mason City deli department had been well off from these targets prior to Thompto's taking over the department.

The record is undisputed that Thompto was never able to bring the Mason City deli's performance in line with the targets or to bring it in line with company-wide performance. For the second quarter of 1991, during which Thompto was responsible for the deli for only a little over two of the three months, the Mason City deli showed gross profits of 28.36%, or 11.64 percentage points under goal, and had a labor cost percentage of 34.67%, or at least 4.67 percentage points over goal. During the third quarter of 1991,

the Mason City deli showed gross profits of 29.77%, or 10.23 percentage points under goal, and labor costs of 36%, or at least 6 percentage points over goal. During the fourth quarter of 1991, the Mason City deli showed gross profits of 15.32%, or 24.68 percentage points under goal, and labor costs of 31.2%, or at least 1.2 percentage points over goal.

Thompto's first employee evaluation was conducted on June 20, 1991, approximately two months after she started as the deli department manager. That employee evaluation rates her performance generally as "good" to "very good." The evaluation, by Bill Landowski, notes that a subsequent evaluation would be in greater depth on Thompto's management abilities. As weak points, Mr. Landowski noted that Thompto "[n]eeds to work on interpersonal communication skills with Deb (assistant deli manager) and rest of staff." Thompto's self-evaluation targeted improvement in her relationship with her assistant manager, profit, and training of employees.

During the third quarter of 1991, on September 23, 1991, Thompto learned that her husband had a brain tumor which required hospitalization and treatment at the Mayo Clinic in Rochester, Minnesota. Thompto received approximately two weeks of leave at full pay to accompany her husband to Rochester. Coborn's covered Thompto's absences during this period by providing staff to the Mason City Cash Wise Store from other deli departments in stores it owned in the region. At some point after her return to Mason City, Thompto asked the Mason City store manager, Dave Meyer, about cancer insurance coverage she believed she had been offered and had accepted during her orientation and for which deductions had been made to each of her paychecks. Meyer referred her to Mark Coborn of Coborn's Human Resources office in St. Cloud, Minnesota. Mark Coborn replied to Thompto's inquiries by conducting a brief investigation, then noti-

---

2. Plaintiff's Exhibit C to the Affidavit of Tressa A. Thompto In Opposition To The Motion For Partial Summary Judgment indicates that the labor cost target for the Mason City deli department actually decreased quarterly during 1991; however, the deposition testimony of Coborn's Deli

Supervisor, Bill Landowski, was that the target set for the entire year was 30%. The record establishes that Thompto was never able to bring the labor costs in line with either the 30% target or any lower percentage target.

fying Thompto that she had never signed up for the cancer insurance and that the deductions for cancer insurance were a mistake in coding her dental insurance deductions. Mark Coborn conducted a further investigation of cancer insurance coverage for Thompto, but found that the carrier of the policy, American Family Insurance, would be willing to cover Thompto and her children, but not her husband because of his pre-existing cancer diagnosis.

On October 16, 1991, Thompto received a second employee evaluation. It is not clear from the record whether this evaluation preceded or followed Thompto's inquiries concerning cancer insurance coverage. However, the evaluation this time described Thompto's performance as "inadequate" or "weak," with a few categories evaluated as "average." The summary evaluation was "weak performance," and because of the negative nature of this evaluation, a reevaluation was requested for January of 1992.

On her December 21, 1991, paycheck, Coborn's refunded to Thompto the $22.92 that it stated had been incorrectly deducted from prior paychecks for cancer insurance. Thompto's husband called Coborn's St. Cloud corporate offices on December 23, 1991, to discuss the cancer insurance problem with Coborn's benefits coordinator, Marilyn Seanger. Seanger explained that the deductions for cancer insurance were a computer error, and prepared a letter of explanation dated January 7, 1992, which was delivered to Thompto by Bill Landowski on January 9, 1992.

On January 2, 1992, Landowski made a visit to the Mason City store for the purpose of discussing deli performance and scheduling the reevaluation of Thompto's performance requested in the October 16, 1991, evaluation. Items of concern listed on Landowski's store visit form included November gross profits problems, excessive labor costs, lack of organizational skills, and scheduling of the actual reevaluation. In deposition, Landowski testified that he went over each of these items with Thompto during this visit, although Thompto states that they did not discuss each item and that she initialled a blank form.

On January 9, 1992, Landowski and Meyer met with Thompto and terminated her employment. The summary evaluation stated "inadequate—improvement questionable." Summary comments by Meyer and Landowski included statements that "gross profits show no improvement," labor costs were over projections, unacceptable presentation of display cases, and concern over service as the result of declining sales and complaints. Thompto refused to sign the termination evaluation forms.

Following Thompto's termination, Meyer provided information to Job Service and civil rights investigators which included evaluation forms, termination forms, and written statements. Meyer also informed department managers at a meeting that Thompto had been terminated. Meyer testified in deposition that at most he indicated to department managers that Thompto's termination had been for poor job performance, although he stated that he doesn't remember specifically whether or not he gave any reason.

### B. Disputed Facts

Thompto asserts that there are substantial disputes as to material facts. Thompto asserts that at her orientation, Meyer asked her if she wanted cancer insurance, and she said yes. Thompto was not advised that any further steps were necessary to initiate cancer insurance coverage. She asserts that she did not learn that Meyer's representations that cancer insurance was available were false until her inquiries concerning coverage in October of 1991. She therefore asserts that she paid for insurance coverage that did not exist on the representations of Meyer.

Coborn's asserts that the cancer insurance at issue was not a direct benefit provided by Coborn's, but was an insurance policy offered directly by American Family to Coborn's employees for which Coborn's would collect premiums if requested by employees. Coborn's asserts that the American Family cancer insurance policy was not made available to employees by American Family until some time after Thompto was hired, and that Coborn's never did more than collect the premiums for such insurance. Employees desiring

this insurance, Coborn's asserts, had to sign up for it directly with an American Family agent, not through Coborn's.

Thompto also alleges that she was given inadequate training to confront the problem of turning around the Mason City deli. Despite that inadequate training, Thompto asserts that she actually improved gross profits from the first to third quarters of 1991 and improved the deli's labor cost figures from the first to fourth quarter of 1991. Thompto asserts that Landowski told her not to worry about the negative evaluation in October, although Landowski denies that. Thompto alleges that Landowski told the deli department employees in an October pre-holiday seminar that they were doing a good job. Landowski states that this was a motivational seminar, not an evaluation. Thompto asserts that the negative evaluations in October and January came without prior notice of poor performance and therefore are mere subterfuges to discredit her claims of sexual harassment, wrongful discharge, and defamation. Thompto also alleges that employees with performance records similar to her own have been retained by Coborn's.

Thompto asserts that she was fired after making several reports of sexual harassment and inappropriate conduct by employees at the Mason City Cash Wise Store, but that her complaints were ignored by the store manager, Dave Meyer. In fact, Thompto alleges that Meyer engaged in some of the inappropriate conduct of which she now complains.[3] Thompto also alleges that her termination followed closely on the heels of a telephone call she made to Landowski on January 6, 1992, in which she demanded an apology and explanation for the failure to provide cancer insurance coverage and stated her intention to get a lawyer if she did not get an apology and explanation. Landowski

testified in deposition that he recalls Thompto asking him about cancer insurance, but does not recall any demand for an apology or explanation or any threats by Thompto to get an attorney.

Finally, Thompto alleges that Meyer made demonstrably false statements to the Mason City Human Rights Commission concerning Thompto's performance. Thompto also asserts that she was compelled to reveal the alleged reasons for her termination by Coborn's to an extensive list of prospective employers when she applied for jobs. Thompto therefore alleges that she was compelled to self-publish defamatory statements made by Coborn's about her performance in her vocation or trade.

## IV. LEGAL ANALYSIS

Although no party has raised the issue, the court must first consider whether and to what extent Thompto may assert tort claims for some of the wrongful conduct she alleges in light of the exclusive remedy provisions of Iowa Code Ch. 216 (1993). The court will then consider Coborn's motion for partial summary judgment on Thompto's claims of wrongful or retaliatory discharge, intentional infliction of emotional distress, and defamation.

### A. Tort Claims And Iowa Code Ch. 216

■■■ Iowa Code Chapter 216 (1993), formerly Iowa Code Chapter 601A (1991), established the Iowa Civil Rights Commission and provides statutory remedies for enforcement of basic civil rights. *Greenland v. Fairtron Corp.*, 500 N.W.2d 36, 37 (Iowa 1993). The Iowa Supreme Court has said that section 601A.16(1), now 216.16(1), renders the chapter's remedies exclusive and preemptive.[4] *Greenland*, 500 N.W.2d at 37;

3. The court need not detail Thompto's allegations of sexual harassment here, because the sexual harassment count is not a subject of this ruling, and, the court concludes below, any wrongful or outrageous conduct based on sexual harassment or discrimination underlying the counts at issue here is properly remedied only in the sexual harassment count.

4. In the cases cited herein, the Iowa Supreme Court has consistently described the effect of

Chapter 216 on other claims arising out of discrimination as "preemption." However, the court believes that Chapter 216 actually provides the "exclusive remedy" for such claims, Iowa Code § 216.16(1), rather than "preempting" any claims. "Preemption" has traditionally referred to situations in which federal law displaces state law, or the law of one level of government displaces the law of another:

Under the Supremacy Clause, U.S. Const., Art. VI, cl. 2, state laws that "interfere with, or are

*Grahek v. Voluntary Hosp. Co-op. Ass'n of Iowa, Inc.*, 473 N.W.2d 31, 33 (Iowa 1991); *Northrup v. Farmland Indus., Inc.*, 372 N.W.2d 193, 197 (Iowa 1985). Preemption occurs unless the claims are separate and independent, and therefore incidental, causes of action. *Greenland*, 500 N.W.2d at 38; *Grahek*, 473 N.W.2d at 34; *Vaughn v. Ag Processing, Inc.*, 459 N.W.2d 627, 639 (Iowa 1990). The claims are not separate and independent when, under the facts of the case, success on the claim not brought under chapter 216 requires proof of discrimination. *Greenland*, 500 N.W.2d at 38.

The Iowa Supreme Court has addressed the preemption issue in only a very few cases. The seminal case was *Northrup v. Farmland Indus., Inc.*, 372 N.W.2d 193 (Iowa 1985). In *Northrup*, the court held that then chapter 601A provided the exclusive remedy for alleged wrongful discharge for alcoholism and the plaintiff's independent common-law action for wrongful discharge could not be recognized. *Id.* at 197. However, the court went on to entertain the plaintiff's claim that his discharge for alcoholism constituted intentional infliction of emotional distress. *Id.* at 197–99. The court concluded that discharge of a plant superintendent for alcoholism, when the superintendent has extensive responsibilities for plant opera-

tions, buying, production scheduling, maintenance, and plant safety, was not outrageous conduct, nor was general criticism of the superintendent's performance outrageous. *Id.* at 198.

The court clarified the holding in *Northrup* in *Hamilton v. First Baptist Elderly Hous. Found.*, 436 N.W.2d 336 (Iowa 1989). In *Hamilton*, the plaintiff alleged discharge of an at-will employee in violation of public policy, but the court found that her argument "basically boil[ed] down to an assertion of sex discrimination." *Hamilton*, 436 N.W.2d at 341. The court concluded that *Northrup* held that the civil rights statute preempts independent common law actions also premised on discrimination. *Id.* The court stated that

> [plaintiff] failed in her bid to prove sex discrimination. *Northrup* forbids her a second bite of the apple in the form of an independent common law action also premised on sex discrimination.

*Id.* at 341–42.[5] *See also Borschel v. City of Perry*, 512 N.W.2d 565, 567–68 (Iowa 1994) (civil rights statute preempts claim of wrongful discharge in violation of public policy when the claim is premised on discriminatory acts, citing *Hamilton*). Similarly, in *Vaughn v. Ag Processing, Inc.*, 459 N.W.2d 627 (Iowa 1990), the court held that the trial

contrary to the laws of congress, made in pursuance of the constitution" are invalid. The ways in which federal law may pre-empt state law are well established. . . . Congress' intent to supplant state authority in a particular field may be expressed in the terms of the statute. Absent explicit pre-emptive language, Congress' intent to supersede state law in a given area may nonetheless be implicit if a scheme of federal regulation is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," if "the Act of Congress . . . touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," or if the goals "sought to be obtained" and the "obligations imposed" reveal a purpose to preclude state authority. *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 604–05, 111 S.Ct. 2476, 2481–82, 115 L.Ed.2d 532 (1991) (citations omitted). Thus, "where [state] law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress," federal preemption occurs. *John Hancock Mut. Life Ins. Co. v. Harris Trust &*

*Sav. Bank*, —— U.S. ——, ——, 114 S.Ct. 517, 526, 126 L.Ed.2d 524 (1993) (citing *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984)). The situation here is not such a case of displacement of law among levels of government. Rather, it is one of determining which state law, statutory or common law, provides the exclusive remedy for alleged wrongs.

**5.** This court concludes that the distinction between the common-law claim in *Northrup* of wrongful discharge on the basis of alcoholism, held to be based on discrimination and therefore preempted by chapter 601A, and the claim of intentional infliction of emotional distress for discharge on the basis of alcoholism, not preempted by 601A, is because the plaintiff did not need to prove *discrimination* on the basis of alcoholism to mount the emotional distress claim. The *Northrup* court did not explain why the emotional distress claim was independently cognizable when the wrongful discharge claim was not even though both alleged that the employer's conduct was motivated by the plaintiff's alcoholism.

court properly dismissed as preempted by the civil rights statute claims of wrongful discharge, unfair employment practices, and termination in bad faith and actual malice because all were based on religious discrimination. *Vaughn,* 459 N.W.2d at 639. The court also held that a claim based on violation of criminal statutes was preempted. *Id.* at 638. However, the court held that a claim of breach of contract was not preempted, because it was a separate and independent cause of action triable to a jury. *Id.* at 639.

In *Grahek v. Voluntary Hosp. Co-op,* 473 N.W.2d 31 (Iowa 1991), the court also held that a breach of contract claim was not preempted by the civil rights statute even when the plaintiff believed that he was fired because of his age because

> [plaintiff] need not prove it to be successful in his contract claim. In this count he is claiming that the employment contract was breached by his premature termination in violation of the terms of the alleged contract. The claim of age discrimination is only incidental to the separate and independent cause of action for breach of contract.

*Grahek,* 473 N.W.2d at 34. However, the court distinguished wrongful discharge claims based on at-will employment from the one encountered by the plaintiff alleging breach of an employment contract, noting that "in an at-will situation, either party may terminate the employment at any time for any reason except discrimination under chapter 601A or violation of public policy." *Id.* The court concluded that

> [s]ince in at-will employment situations involving allegations of discrimination the claim of wrongful discharge and the claim of discrimination are one and the same, Iowa Code section 601A.16 requires that the employee follow the procedures provided in that chapter.

*Id.* The court did find that the plaintiff's breach of implied covenant of good faith and fair dealing claims were preempted because

> the only act of bad faith which [plaintiff] alleges is age discrimination. Thus, as in at-will employment arrangements, the bad faith claim and the chapter 601A civil

rights claim are the same. Therefore, chapter 601A preempts the tort claim.

*Id.* Claims of fraudulent and negligent misrepresentation, which were not based on unfair or discriminatory practices, but on earlier acts, were not preempted. *Id.* at 35.

Finally, in a recent case, the Iowa Supreme Court held that a claim of intentional infliction of emotional distress was preempted by chapter 601A because the plaintiff had to prove sexual discrimination to be successful in the emotional distress claim. *Greenland v. Fairtron Corp.,* 500 N.W.2d 36, 38 (Iowa 1993). The court held that the test is whether, in light of the pleadings, discrimination is made an element of the alternative claims. *Id.*

> We think the answer with regard to the emotional distress claim is yes, resulting in preemption. Discrimination through sexual harassment is the "outrageous conduct" [plaintiff] specifically alleges in her claim for intentional infliction of emotional distress. So under the facts she alleges, if she were to fail in her claim of discrimination, [plaintiff] would necessarily fail in her claim of intentional infliction of emotional distress. Stated otherwise, it is impossible for [plaintiff] to establish the emotional distress she alleges without first proving discrimination.

*Id.* The court also addressed the apparent inconsistency between this holding and the *Northrup* decision in which the court had entertained an emotional distress claim based on termination for alcoholism after concluding that the plaintiff had a viable claim under 601A for discrimination on the basis of alcoholism. *Northrup,* 372 N.W.2d at 197–99. The court in *Greenland* noted that contrary to the plaintiff's contentions, the decisions in *Vaughn* and *Northrup* did not implicitly allow separate claims for intentional infliction of emotional distress in conjunction with chapter 216 discrimination claims, because preemption of the emotional distress claims was never raised or considered in either appeal. *Greenland,* 500 N.W.2d at 38.

In the present case, Thompto originally brought claims of age and sex discrimination under Iowa Code § 216, but has now

withdrawn claims based on age discrimination. She has also asserted two common-law tort claims, wrongful discharge and intentional infliction of emotional distress, that appear from the complaint to be based at least in part on the same conduct Thompto has alleged was sexually discriminatory. In her complaint, in both Count V (wrongful or retaliatory discharge) and Count VII (intentional infliction of emotional distress), Thompto asserts that the tort claim is based on all of the preceding allegations, which include the allegations of sex discrimination. In light of the authorities cited above, Iowa Code § 216.6 provides the exclusive remedy for any portions of Thompto's tort claims that are based on sex discrimination. However, Thompto has also alleged that both of her tort claims are based on conduct she has not asserted and the court does not find to be sexually discriminatory. Both tort claims are based at least in part on Coborn's alleged termination of Thompto's employment for inquiring about cancer insurance coverage and requesting an explanation for why the coverage was not available, and for threatening to get a lawyer to obtain that coverage or an explanation. It is not necessary to prove sex discrimination in this case for Thompto to prevail on her common-law tort claims. Therefore, Coborn's is entitled to summary judgment on Counts V and VII at this point only to the extent that those claims are based on sex discrimination for which the claim in Count II provides Thompto's exclusive remedy.

### B. The Claim Of Wrongful Discharge In Violation Of Public Policy

The court must next consider whether the conduct of Coborn's alleged by Thompto that is not also alleged to be sexually discriminatory is sufficient to support a common-law claim of wrongful or retaliatory discharge. Thompto asserts that, although she was an at-will employee, she was wrongfully discharged in violation of public policy when Coborn's fired her in retaliation for inquiring about cancer insurance coverage and requesting an explanation for why the coverage was unavailable and for threatening to consult a lawyer to obtain that coverage or an explanation. Coborn's has moved for sum-

mary judgment in its favor on Thompto's claim of wrongful or retaliatory discharge on the ground that the Iowa Supreme Court has never recognized a public policy exception protecting an at-will employee from termination on the basis of that employee's inquiries concerning insurance coverage. Thompto resists summary judgment on this count on the ground that there is a genuine issue of material fact as to whether or not she was terminated for discriminatory or retaliatory reasons rather than for poor performance as alleged by Coborn's, and on the ground that this court should recognize a public policy exception to termination of an at-will employee protecting her from termination for inquiring about cancer insurance coverage and requesting an explanation for why that coverage was unavailable, and for threatening to get a lawyer to obtain that coverage or an explanation.

The Iowa Supreme Court was slow to recognize a cause of action for the wrongful discharge of an at-will employee, instead relying on the general rule that an at-will employee may be terminated at any time, for any reason. *See Abrisz v. Pulley Freight Lines, Inc.*, 270 N.W.2d 454, 455 (Iowa 1978); *Harper v. Cedar Rapids Television Co., Inc.*, 244 N.W.2d 782, 791 (Iowa 1976); *Allen v. Highway Equip. Co.*, 239 N.W.2d 135, 139 (Iowa 1976). In *Northrup v. Farmland Indus., Inc.*, 372 N.W.2d 193 (Iowa 1985), the court stated that

> [t]his court has never expressly recognized a public policy exception [to the employment at will doctrine], although we recently noted its increasing acceptance in other jurisdictions. [Citations omitted].

> While we hinted in *Abrisz* that, under proper circumstances, we would recognize a common-law claim for a discharge violating public policy, we did not apply it there because the facts did not establish such a violation. We observed, moreover, that "[c]ourts should not declare conduct violative of public policy unless it is clearly so." *Abrisz*, 270 N.W.2d at 456. It has been observed, in fact, that successful common-law claims for wrongful discharge have been based in large part on violations of independent statutory policy, not those es-

tablished by court decisions. *See* Note, *Protecting At–Will Employees [Against Wrongful Discharge: The Duty to Terminate Only in Good Faith]*, 93 Harv.L.Rev. at 1822–23.

*Northrup v. Farmland Indus., Inc.*, 372 N.W.2d 193, 196 (Iowa 1985). The court then went on to find an express public policy prohibiting discharges for "disabilities," but held that a claim of wrongful discharge based on a disability was preempted by the exclusive remedies of Iowa Code Ch. 601A (now Iowa Code Ch. 216). *Id.* As in *Abrisz*, the court again refused to recognize a claim of wrongful discharge in violation of public policy in *Haldeman v. Total Petroleum, Inc.*, 376 N.W.2d 98 (Iowa 1985), because "we simply observe that this case would not fall into such an exception." 376 N.W.2d at 105. In *Haldeman*, the plaintiff's claim of wrongful discharge was based on her discharge as a cashier following discovery of "unexplained shortages." *Id.* In *Cross v. Lightolier Inc.*, 395 N.W.2d 844 (Iowa 1986), the Iowa Supreme Court recognized that jurisdictions were split on whether an action for wrongful discharge under a mandate of public policy is a contract or tort action. 395 N.W.2d at 849. However, the court upheld the trial court's conclusion that plaintiff's claim of breach of an oral contract was a contract and not a tort claim, and reiterated that "[e]mployment at will ... cannot be used as a basis for an action for wrongful discharge or breach of employment contract." *Id.* (quoting *Haldeman*, 376 N.W.2d at 105).

It was not until 1988 that the Iowa Supreme Court recognized a cause of action for discharge that frustrates a well-recognized and defined public policy of the state in the case of *Springer v. Weeks & Leo Co., Inc.*, 429 N.W.2d 558, 560 (Iowa 1988) (hereinafter *Springer I*).[6] However, the court considered the cause of action to be one of tortious interference with a contract of hire. *Springer I*, 429 N.W.2d at 560. The court later concluded that this characterization "may have been misleading," and cited cases clarifying the court's development and refinement of the tort. *Springer v. Weeks & Leo Co.,*

*Inc.*, 475 N.W.2d 630, 632–33 (Iowa 1991) (hereinafter *Springer II*). The court has construed *Springer I* as holding that if the discharge of an employee at will is in violation of public policy, the employee has a cause of action in tort against the employer. *Smith v. Smithway Motor Xpress, Inc.*, 464 N.W.2d 682, 685 (Iowa 1990). *See also Vaughn v. Ag Processing, Inc.*, 459 N.W.2d 627, 637 (Iowa 1990) (in *Springer I*, "the court recognized an at-will employee's right to compensation for wrongful discharge in violation of a 'clearly articulated public policy of this state'"); *Fogel v. Trustees of Iowa College*, 446 N.W.2d 451, 455 (Iowa 1989) (citing *Springer I* for the same proposition).

As the law now stands in Iowa, the general rule is still that an at-will employee may be discharged at any time, for any reason, or no reason at all. *Borschel v. City of Perry*, 512 N.W.2d 565, 566 (Iowa 1994); *Lara v. Thomas*, 512 N.W.2d 777, 781 (Iowa 1994); *French v. Foods, Inc.*, 495 N.W.2d 768, 769 (Iowa 1993); *Grahek v. Voluntary Hosp. Co-op.*, 473 N.W.2d 31, 34 (Iowa 1991); *Fogel*, 446 N.W.2d at 455. The court has recognized two exceptions to this general rule in which a cause of action for wrongful discharge of an at-will employee will lie: The first is where the discharge is in clear violation of a "well-recognized and defined public policy of this state," and the second is where a contract is created by an employer's handbook or policy manual. *Borschel*, 512 N.W.2d at 566; *French*, 495 N.W.2d at 769–70; *Fogel*, 446 N.W.2d at 455. *See also Lara*, 512 N.W.2d at 782 (case involved "one of the exceptions," discharge in violation of public policy); *Grahek*, 473 N.W.2d at 34 ("termination of an employment at-will is generally not actionable in the absence of discrimination or a public policy violation."); *Vaughn*, 459 N.W.2d at 638 (public policy exception only discussed); *Niblo v. Parr Mfg., Inc.*, 445 N.W.2d 351, 355 (Iowa 1989) (public policy exception only discussed). The public policy exception is based on the theory that the law should not allow employees to be fired for reasons that violate public policy. *Borschel*, 512 N.W.2d at 567 (citing 82 Am.

**6.** The opinion in *Springer I* cites no fewer than thirteen other states that had judicially recog-

nized the public policy exception to employment at will.

Jr.2d, *Wrongful Discharge* § 15, at 687 (1992)).

Under the public policy exception, the Iowa Supreme Court has recognized causes of action for tortious discharge where an employer's retaliatory discharge would conflict with certain legislatively declared goals. *Lara,* 512 N.W.2d at 782. Such policies may be expressed in the constitution and the statutes of the state, *Borschel,* 512 N.W.2d at 567 (citing 82 Am.Jr.2d, *Wrongful Discharge* § 19, at 692 (1992)), although enforcement of the tort based on some policies is preempted by enforcement under the statutes embodying those policies themselves:

> The legislature may explicitly prohibit the discharge of an employee who acts in accordance with a statutory right or duty. *See, e.g.,* Iowa Code ch. 216 (1993) (civil rights statute transferred from Iowa Code ch. 601A). Discharge of an employee because of age, race, creed, color, sex, national origin, religion, or disability is an unfair employment practice. Iowa Code § 216.6. Remedies are provided employees who are discharged in violation of the statute. *See* Iowa Code § 216.15. Our civil rights statute, however, preempts an employee's claim that the discharge was in violation of public policy when the claim is premised on discriminatory acts. *Hamilton v. First Baptist Elderly Hous. Found,* 436 N.W.2d 336, 341–42 (Iowa 1989).

*Borschel,* 512 N.W.2d at 567–68. The *Borschel* court then identified the circumstances in which Iowa courts had found a public policy basis for the tort:

> In the absence of an express prohibition, the court of appeals found an implied cause of action for wrongful termination when the reason for discharge is the employee's failure or refusal to violate a law in the course of employment. *Wilcox v. Hy-Vee Food Stores, Inc.,* 458 N.W.2d 870, 872 (Iowa App.1990). The court of appeals found that the violation of a statute prohibiting an employer from requiring an employee to take a polygraph examination was a violation of public policy, thus a private cause of action existed. *Id.* at 872. At the time the claim arose the statute did not expressly allow for a cause of action.

This statute was later amended to so provide. *Id.*

> Also we have found an implied prohibition against retaliatory discharge based on an employee's exercise of a right conferred by a clearly articulated legislative enactment. *See Lara v. Thomas,* 512 N.W.2d 777, 780 (Iowa 1994) (discharge in retaliation for filing partial unemployment claim); *Niblo v. Parr Mfg., Inc.,* 445 N.W.2d 351, 353 (Iowa 1989) (employee discharged because she threatened to file a workers' compensation claim); *Springer [I],* 429 N.W.2d at 560 (cause of action exists when the employee's discharge serves to frustrate the public policy expressed in the workers' compensation statute).

*Borschel,* 512 N.W.2d at 568. A wrongful or retaliatory discharge in violation of public policy is therefore an intentional wrong committed by the employer against an employee who chooses to exercise some substantial right. *Niblo,* 445 N.W.2d at 355 (citing *Perks v. Firestone Tire & Rubber Co.,* 611 F.2d 1363, 1366 (3d Cir.1979)). The remedy for the tort should be for the employee's complete injury, including out-of-pocket loss of income and causally connected emotional harm. *Id.*

Thompto asserts that this court should recognize public policy exceptions to the at-will employment doctrine in this case. She asserts that her termination for inquiring about cancer insurance coverage to which she believed she was entitled, and requesting an explanation of why it was unavailable, violated public policy. She also appears to assert that her termination for threatening to get a lawyer to assist her in obtaining the cancer insurance coverage or an explanation of why it was unavailable violated public policy. However, Thompto has not identified any clear articulation of these two public policies of the state of Iowa upon which this court could base such exceptions to the employment at-will doctrine. Coborn's argues that the Iowa Supreme Court has never recognized either of the public policy exceptions Thompto asserts. The court will conduct its own examination of whether clear articulations of public policy of the state of Iowa support Thompto's assertions of exceptions

to the at-will employment doctrine in her case.

### 1. Public Policy And Inquiries About Insurance Benefits

Thompto has identified no clear articulation of the public policy of this state that would create an exception to the at-will employment doctrine for an employee who asserts that her termination was the result of inquires about cancer insurance coverage she believed she had been promised by her employer and requesting an explanation of why that insurance coverage was not available. Thompto may be asserting that her situation is analogous to that of an employee who is fired for asserting or inquiring about filing claims for workers' compensation benefits or unemployment benefits. The Iowa Supreme Court has recognized that public policy provides an exception to the at-will employment doctrine for employees in these situations. *See Borschel,* 512 N.W.2d at 568; *Lara,* 512 N.W.2d at 780 (discharge in retaliation for filing partial unemployment claim); *Niblo,* 445 N.W.2d at 353 (employee discharged because she threatened to file a workers' compensation claim). An important distinction between filing claims for workers' compensation and unemployment benefits and claims for health insurance benefits is that workers' compensation and unemployment schemes are legislatively mandated. However, the Iowa Supreme Court has never considered the question of whether inquiries about or filing claims for other kinds of insurance that do not stem from legislative mandates would also provide a public policy exception. In the only cases the court has located that consider the question, the answer has been no. *See, e.g., Shearson Lehman Bros., Inc. v. Hedrich,* 266 Ill.App.3d 24, 203 Ill.Dec. 189, 194, 639 N.E.2d 228, 233 (1994) (terminating an employee for submitting an insurance claim under the health insurance plan provided by the employer is a "purely private matter" for which a wrongful discharge action will not lie, citing *Price v. Carmack Datsun, Inc.,* 109 Ill.2d 65, 68–69, 92 Ill.Dec. 548, 550, 485 N.E.2d 359, 361 (1985)).

 This court is nonetheless persuaded that Iowa does have a clearly articulated public policy which would allow a claim of wrongful discharge to lie based upon the circumstances Thompto has alleged concerning her inquiries about insurance coverage and request for an explanation of why coverage was not available. The first source of such a public policy is to be found in the Iowa Wage Payment Collection Act, Iowa Code Ch. 91A. Iowa Code § 91A.5 provides in pertinent part that

> 1. An employer shall not withhold or divert any portion of an employee's wage unless:
>
> a. The employer is required or permitted to do so by state or federal law or by order of a court of competent jurisdiction; or
>
> b. The employer has written authorization from the employee to so deduct for any lawful purpose accruing to the benefit of the employee.

Iowa Code § 91A.5(1). As a result of this requirement that an employer make only authorized deductions, under Iowa Code § 91A.6, an employee has a right to demand an accounting of deductions:

> 3. Within ten working days of a request by an employee, an employer shall furnish to the employee a written, itemized statement listing the earnings and deductions made from the wages for each pay period in which the deductions were made together with an explanation of how the wages and deductions were computed....

Iowa Code § 91A.6(3). Thompto made such a demand for an accounting and explanation of the deductions from her paycheck for cancer insurance and why she did not receive the coverage those deductions were purportedly meant to provide. The legislature, by providing for demands for accounting and explanation, clearly articulated a policy that an employee not be fired for making such a demand or inquiry.

 Although the Iowa Wage Payment Collection Act provides for its own remedial procedures in Iowa Code § 91A.10 for employees who seek to recover unpaid wages and are discharged in retaliation, that remedy does not preclude Thompto's tort claims here. The wrong of which Thompto com-

plains is not failure to pay wages or retaliation for a claim for unpaid wages, for which Iowa Code Ch. 91A provides a remedy.[7] Thompto has already been reimbursed for the deductions erroneously made for cancer insurance. Thompto's complaint is that she was discharged for making the inquiries provided for in Iowa Code § 91A.6(3). The court concludes that Thompto's remedy for discharge violating the legislative policy embodied in Iowa Code § 91A.6(3), that employees have a right to inquire about and demand explanations for deductions from their wages, is a tort action for wrongful discharge.

▮▮▮ A second legislative enactment provides a clear articulation of Iowa public policy that protects Thompto from discharge in the circumstances alleged here. In the context of an employee's benefits under a group health insurance plan, Iowa Code § 509B.5 provides that employers shall be. liable for failure to provide insurance benefits for which they have collected contributions through payroll deductions:

> 4. The employer or group policyholder is also solely liable for benefits, including extended benefits, which would have been payable had the accident or health insurance been in force and the employees or members been covered by the accident or health insurance during a period of time for which the employer or group policyholder has collected contributions through payroll, withholding, or otherwise, but has failed to enroll the employees or members, unless the employer or group policyholder has given actual notice that enrollment in the plan will not become effective until a later date or until the employee's or member's application for enrollment has been approved.

Iowa Code § 509B.5(4).[8] Although Coborn's asserts that the cancer insurance at issue here was not a group policy provided to employees as a benefit, there is at least a genuine issue of material fact as to whether or not the cancer insurance was represented to Thompto as a group insurance employment benefit and whether or not Thompto was informed that she had to take any further steps to complete her application for this insurance. Iowa Code § 509B.5(4) is a clear articulation of Iowa public policy that an employer may not collect premiums for insurance without properly enrolling employees in that insurance or advising the employees of what steps they must take to become properly enrolled. That public policy would be violated by discharging an employee who inquires about or asserts a right to insurance benefits she reasonably believed were provided as a benefit of employment and for which deductions had been made from her paycheck by the employer.[9]

---

**7.** The court recognizes that a number of courts have held that the public policy exception does not extend to employees who sue or state an intention to sue their employers for wages or fees. *See, e.g., Abrams v. Echlin Corp.,* 174 Ill. App.3d 434, 123 Ill.Dec. 884, 528 N.E.2d 429 (1988) (holding that an at-will employee who was discharged after threatening to take legal action to secure payment of wages had not stated a retaliatory discharge claim under the public policy exception); *Buysse v. Paine, Webber, Jackson & Curtis, Inc.,* 623 F.2d 1244 (8th Cir.1980) (holding that under Minnesota law, employer was within its rights when it discharged an at-will employee who sued the employer for fees); *Alexander v. Kay Finlay Jewelers, Inc.,* 208 N.J.Super. 503, 506 A.2d 379, *appeal denied,* 104 N.J. 466, 517 A.2d 449 (1986) (holding that discharge of at-will employee for suing the employer over a salary dispute did not state a cause of action for retaliatory discharge under the public policy exception). However, the court is not confronted with such a case here; rather, the court has identified a clearly articulated public policy which entitles an employee to demand itemization and explanation of deductions to her paycheck, which the court holds protects that employee from discharge for demanding such an accounting.

**8.** Iowa Code § 509B does not provide remedies or enforcement procedures for violation of its provisions.

**9.** Since the occurrence of the events giving rise to this lawsuit, the Iowa legislature has made a clear articulation of an employer's obligation to provide *access* to health care. On May 13, 1994, the Iowa legislature approved amendments to Iowa Code Ch. 505 in SF 2282, among which is new section 505.21. That new section provides in pertinent part:

> 1. The commissioner shall adopt rules establishing a requirement that an employer provide access to health care to the employees of the employer. The rules shall provide that an employer doing business within this state shall offer each employee, at a minimum, access to health insurance. The requirement contained

The court concludes that clearly articulated public policies of Iowa provide an exception to the at-will employment doctrine in the circumstances Thompto has alleged concerning her inquiries about cancer insurance benefits and requests for an explanation of why the coverage was unavailable. Coborn's motion for summary judgment on Thompto's claim of wrongful discharge in violation of public policy must therefore be denied to the extent the claim is founded on alleged termination for inquiring about cancer insurance benefits and requesting an explanation of why the benefits were not available.

### 2. Public Policy And Threats To Consult An Attorney

■ Thompto's claim of wrongful discharge also requires the court to consider whether there is a public policy exception to the employment at-will doctrine for an employee who was allegedly discharged for threatening to "get a lawyer"—that is, to consult a lawyer—concerning a dispute with an employer. Again, Thompto has not pro-

vided any foundation for finding such a public policy, but the court believes that it is fundamental that such public policy exists.

■ First, because the court finds fewer legislative statements of public policy pertinent to this issue, the court must consider whether there are other proper sources of such a public policy. Although the Iowa Supreme Court has stated that causes of action for tortious discharge in violation of public policy rest on "certain legislatively declared goals," *Lara*, 512 N.W.2d at 782, and that "[s]uch policies may be expressed in the constitution and the statutes of the state," *Borschel*, 512 N.W.2d at 567 (citing 82 Am.Jr.2d, *Wrongful Discharge* § 19, at 692 (1992)), this court does not read these cases as suggesting that legislative pronouncements or the state constitution itself are the sole sources of public policy. The language of *Borschel*, "may be expressed," is permissive, not mandatory. A number of other jurisdictions have found public policy to be articulated in the judicial decisions of the state's courts.[10] In the seminal case finding

---

in this section may be satisfied by offering any of the following:

 a. Health care coverage through an insurer or health maintenance organization authorized to do business in this state.

 b. Access to health benefits through a health benefits plan qualified under the Federal Employee Retirement Income Security Act of 1974.

 2. An employer may financially contribute toward the employee's health benefit plan. The employer shall offer payroll deduction of employee contributions and direct deposit of premium payments related to a health insurance purchasing cooperative or other health care coverage.

Iowa S.F. 2282, 75th Gen. Assembly (1994). Although enacted too late to benefit Thompto directly, this enactment supports the conclusion that Iowa now has a public policy protecting an employee who raises questions about or demands health care coverage, because there is now a legislative enactment mandating health care coverage by employers placing health care benefits on a footing similar too, albeit different from, workers' compensation and unemployment benefits.

**10.** *See, e.g., Building Serv. Employees Int'l Union, Local 262 v. Gazzam*, 339 U.S. 532, 537, 70 S.Ct. 784, 787, 94 L.Ed. 1045 (1950) ("The public policy of any state is to be found in its constitution, acts of the legislature, and decisions of its courts."); *Anderson v. Jackson Mun. Airport Auth.*, 691 F.2d 742, 753 (5th Cir.1982) (Missis-

sippi is committed to the doctrine that public policy of the state must be found in its constitution and statutes, "and when they have not directly spoken, then in the decisions of the courts and the constant practice of the government officials," citing *State ex rel. Knox v. Edward Hines Lumber Co.*, 150 Miss. 1, 115 So. 598 (1928), and *see also Anderson v. Jackson Mun. Airport Auth.*, 419 So.2d 1010, 1023 (Miss.1982)); *Hutson v. Analytic Sciences Corp.*, 860 F.Supp. 6, 3 (D.Mass.1994) (applying Massachusetts law, and including judicial decisions among the sources of public policy); *Hicks v. Resolution Trust Corp.*, 736 F.Supp. 812, 815 (N.D.Ill.1990) (applying Illinois law, and finding judicial decisions among the sources of public policy); *Washington v. Kaiser Aluminum & Chem. Corp.*, 118 Wash.2d 46, 821 P.2d 18 (1991) (opinion on certified question to the United States District Court for the Eastern District of Washington holding that public policy may be judicially recognized even in the absence of statutory authority); *Williams v. Patton*, 821 S.W.2d 141, 148 (Tex.1991) (concurring opinion, recognizing the Texas also finds public policy in judicial decisions); *Salter v. Alfa Ins. Co., Inc.*, 561 So.2d 1050, 1056 (Ala.1990); *Watson v. Cleveland Chair Co.*, 789 S.W.2d 538, 540 (Tenn.1989) (including judicial decisions among the sources of public policy); *O'Hara v. Ahlgren, Blumenfeld & Kempster*, 127 Ill.2d 333, 130 Ill. Dec. 401, 405, 537 N.E.2d 730, 734 (1989) (same); *Barr v. Kelso–Burnett Co.*, 106 Ill.2d 520, 527, 88 Ill.Dec. 628, 631, 478 N.E.2d 1354, 1357 (1985) (same); *Wagenseller v. Scottsdale Memori-*

a public policy exception to the employment at-will doctrine, the Illinois Supreme Court held that a "clearly mandated public policy ... is to be found in the State's constitution and statutes and, when they are silent, in its judicial decisions." *Palmateer v. Int'l Harvester Co.*, 85 Ill.2d 124, 130, 52 Ill.Dec. 13, 15, 421 N.E.2d 876, 878 (1981) (citations omitted). The public policy "must strike at the heart of a citizen's social rights, duties, and responsibilities before the tort will be allowed." *Id.* It "concerns what is right and just and what affects the citizens of the State collectively." *Id.* Other courts have characterized public policy as being violated by that which "had a tendency to be injurious to the public, or against the public good." *Parnar v. Americana Hotels, Inc.*, 65 Haw. 370, 379, 652 P.2d 625, 631 (1982); *In Re Adoption of M.M. a/k/a N.L.M.*, 652 P.2d 974 (Wyo.1982). Finding few legislative statements directly on point, this court will also look to judicial declarations and decide if they articulate public policy by "strik[ing] at the heart" of a citizen's rights and duties or concern "what is right and just," and will consider whether public policy has been violated by acts "injurious to the public, or against the public good."

There is no right to counsel in a civil case articulated under Iowa law except in certain limited circumstances not present here. *See, e.g., Phillips v. Iowa Dist. Court for Johnson County*, 380 N.W.2d 706, 708 (Iowa 1986) (contempt proceedings are "quasi-criminal" and therefore an indigent has a constitutional right to appointment of counsel when "predictive evaluation" suggests that contempt citation may result in jail term, citing *McNabb v. Osmundson*, 315 N.W.2d 9, 11–14 (Iowa 1982)); *State ex rel. Hamilton v. Snodgrass*, 325 N.W.2d 740, 742 (Iowa 1982) (right to counsel in paternity action, listing factors applicable to determination of whether indigent has a right to counsel in non-criminal proceedings). Few courts have addressed the related but much broader question of whether public policy is violated when an employer interferes with an employee's prosecution of litigation, finding wrongful action by the employer only in circumstances also not present here.[11] Courts have also consistently held that no public policy is violated when an employer discharges an at-will employee for filing suit against the employer, unless filing suit is specifically protected by, for example, the workers compensation scheme of the state.[12] Although the court

al Hosp., 147 Ariz. 370, 377, 710 P.2d 1025, 1032 (1985) (same); *Dainton v. Watson*, 658 P.2d 79, 82 (Wyo.1983) (same); *Parnar v. Americana Hotels, Inc.*, 65 Haw. 370, 379, 652 P.2d 625, 631 (1982) (same); *Richmond County v. Pierce*, 234 Ga. 274, 276, 215 S.E.2d 665, 668 (1975) (same); *Payne v. Jackson County, Mo.*, 484 S.W.2d 483, 484 (Mo.1972) (same); *Pacific Employers Ins. Co. v. Indus. Accident Comm'n*, 10 Cal.2d 567, 578, 75 P.2d 1058, 1063 (1938) (same).

11. *See, e.g., Groce v. Foster*, 880 P.2d 902, 904 (Okla.1994) (wrongful discharge action will lie against employer who fires employee for employee's refusal to dismiss common-law action against third party, who was a customer of employer, for redress of on-the-job injuries because to allow employer so to interfere with employee's suit would violate public policy behind legally protected recovery regime for work-related injuries); *King v. Driscoll*, 418 Mass. 576, 583, 638 N.E.2d 488, 493 (1994) (statute conferring on shareholders right to bring derivative suit suggests public policy in favor of allowing shareholders to seek redress for perceived harms by corporation, but is insufficient to justify exception to at-will employment doctrine because it relates to financial well-being of corporation, not employee's rights); *Boykins v. Housing Auth. of Louisville, Ky.*, 842 S.W.2d 527 (Ky.1992) (em-

ployer's firing of at-will employee for filing suit against the employer on a tort claim not related to employee's employment, but to her tenancy of employer-owned housing, did not violate public policy); *Becket v. Welton Becket & Assoc.*, 39 Cal.App.3d 815, 114 Cal.Rptr. 531, 534 (1974) (finding "no strong public policy ... which would insulate an employee who is also a stockholder against discharge from his employment where he has undertaken to file suit and litigate against the management of the employing entity").

12. *See, e.g., Magerer v. John Sexton & Co.*, 912 F.2d 525 (1st Cir.1990) (Massachusetts law would not permit a common law claim for retaliatory discharge where the legislature has provided a statutory workers' compensation scheme that bars discharge for filing claims); *Smolarek v. Chrysler Corp.*, 879 F.2d 1326 (6th Cir.) (under Michigan law, retaliatory discharge claim for filing workers' compensation claims is preempted by statutory scheme), *cert. denied*, 493 U.S. 992, 110 S.Ct. 539, 107 L.Ed.2d 537 (1989); *Beam v. IPCO Corp.*, 838 F.2d 242, 247 (7th Cir.1988) (no public policy of Wisconsin is violated by terminating an employee who brings, or threatens to bring, legal action against his or her employer); *Tynes v. Shoney's, Inc.*, 867 F.Supp.

does not necessarily agree with those decisions holding that no public policy is violated

330 (D.Md.1994) ("An employer of a discontented at-will employee cannot be required to face the choice between retaining the employee or risking an abusive discharge suit" where the employee alleged that he was fired for stating his intention to file criminal charges for battery against his supervisor and employer, citing *Watson v. Peoples Sec. Life'Ins. Co.*, 322 Md. 467, 588 A.2d 760 (1991) (employee fired for filing sexual harassment claims in a suit for assault and battery against her employer was not protected by public policy)); *Deiters v. Home Depot U.S.A., Inc.*, 842 F.Supp. 1023, 1028–29 (M.D.Tenn. 1993) (no public policy of Tennessee violated by discharge of employee for suing employer); *Whitman v. Schlumberger Ltd.*, 793 F.Supp. 228 (N.D.Cal.1992) (no public policy of California is violated by termination of employee who threatened and ultimately filed lawsuit against employer); *Buechele v. St. Mary's Hosp. Decatur, Ill.*, 156 Ill.App.3d 637, 109 Ill.Dec. 83, 509 N.E.2d 744 (1987) (no public policy exception under Illinois law where at-will employee was terminated for suing his employer for defamation and intentional infliction of emotional distress); *Alexander v. Kay Finlay Jewelers*, 208 N.J.Super. 503, 506 A.2d 379, *appeal denied*, 104 N.J. 466, 517 A.2d 449 (1986) (at-will employee is required to forego suit against employer or risk discharge and in those circumstances no public policy is violated); *Watson*, 322 Md. 467, 478–79, 588 A.2d 760 (same); *Kavanagh v. KLM Royal Dutch Airlines*, 566 F.Supp. 242 (N.D.Ill.1983) (same); *Meredith v. C.E. Walther, Inc.*, 422 So.2d 761 (Ala.1982) (same); *Becket v. Welton Becket & Assocs.*, 39 Cal.App.3d 815, 114 Cal.Rptr. 531 (1974) (same). One final point is offered concerning a common theme in this line of cases. There is a fear that finding a public policy exception for an employee fired for suing his or her employee

would metamorphose the supposedly narrow [public policy] exception ... into the monster that swallowed the employment-at-will rule. Whenever a dispute between an employer and an at-will employee threatens to culminate in the employee's discharge, the employee, simply by retaining an attorney and threatening to sue, could procure that which is unavailable to [the employee] through contract-employment security.

*Deiters v. Home Depot U.S.A., Inc.*, 842 F.Supp. 1023, 1028 (M.D.Tenn.1993) (quoting *Kavanagh v. KLM Royal Dutch Airlines*, 566 F.Supp. 242, 244 (N.D.Ill.1983)). This court concludes that this fear is both overstated and out of touch with the reality of other employment litigation. First, the same rationale already applies in discrimination cases and numerous state and federal statutes which contain anti-retaliation provisions. History teaches that in these related contexts, there is no pattern of abuse. Moreover, temporal proximity alone is insufficient to establish a

when an employee is discharged for filing suit against his or her employer,[13] the court

cause of action. For the employee to prevail they must establish not only that they retained or consulted counsel, but that this is the "but for" cause of their discharge. Like any other public policy wrongful discharge case, the employer will prevail if the finder of fact concludes that the employee was discharged for any reason that does not violate public policy offered by the employer no matter how unwise, unfair, or unjust.

13. Although the court does not reach the issue here, the court suggests that rather than finding in all cases that public policy is not violated by an employer's discharge of an employee for filing suit against the employer, such discharges might properly be subjected to a "balancing test" similar to the one applied to discharge of public employees allegedly for exercising rights of free speech. The *"Pickering/Connick"* balancing test is discussed in a number of decisions. *See, e.g., Waters v. Churchill*, —— U.S. ——, ——, 114 S.Ct. 1878, 1886, 128 L.Ed.2d 686 (1994) (citing balancing test as example of government's power as an employer versus its power as a sovereign); *Rankin v. McPherson*, 483 U.S. 378, 391, 107 S.Ct. 2891, 2900–01, 97 L.Ed.2d 315 (1987) ("It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech," but applying the *"Pickering/Connick"* test to determine whether the speech was protected); *Williams v. Kentucky*, 24 F.3d 1526 (6th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 358, 130 L.Ed.2d 312 (1994); *Grantham v. Trickey*, 21 F.3d 289 (8th Cir.1994); *Joyner v. Lancaster*, 815 F.2d 20 (4th Cir.1987). The test to determine whether a public employer has properly discharged an employee for engaging in speech requires "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968). The inquiry is in two steps. The first inquiry is whether the employee's speech "may be 'fairly characterized as constituting speech on a matter of public concern.' " *Rankin*, 483 U.S. at 384, 107 S.Ct. at 2897 (quoting *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983)). The second inquiry is whether the employee's interest in speaking freely is outweighed by the state's interest in promoting efficiency of public services. *Id.* A balancing test would accommodate the interests of the employee in open access to the courts and the employer's interest in maintaining harmony in the workplace. Moreover, a balancing test would serve the employer's proper interest, which is not an interest in discharging any employee who sues the employer, but an

need not and does not reach that issue in the present case. Rather, the court here is confronted with the much narrower question of whether public policy is violated by discharge of an employee for stating an intention to consult an attorney concerning a dispute with an employer. The court concludes that this case presents one of the extremely narrow set of circumstances in which the Iowa court would recognize a violation of public policy by the employer's actions.

The Iowa Supreme Court has always reserved to itself the inherent power to regulate the legal profession in this state, *See, e.g., Matter of Peterson*, 439 N.W.2d 165, 166 (Iowa 1989); *Sonksen v. Legal Serv. Corp.*, 389 N.W.2d 386, 388 (Iowa 1986); *Comm. on Professional Ethics & Conduct v. Michelson*, 345 N.W.2d 112, 115 (Iowa 1984); *Comm. on Professional Ethics & Conduct v. Gartin*, 272 N.W.2d 485, 487 (Iowa 1978); *Comm. on Professional Ethics & Conduct v. Toomey*, 236 N.W.2d 39, 40 (Iowa 1975); *Comm. on Professional Ethics & Conduct v. Bromwell*, 221 N.W.2d 777, 780 (Iowa 1974), and the Iowa legislature has recognized that power by reposing in the Iowa Supreme Court the power to admit persons to practice, Iowa Code § 602.10101; *Peterson*, 439 N.W.2d at 166, and to revoke a person's license to practice. Iowa Code § 602.10121. Towards the end of properly regulating the profession, the Iowa Supreme Court has adopted the Code of Professional Responsibility, the preamble of which states:

The continued existence of a free and democratic society depends upon recognition of the concept that justice is based upon the rule of law grounded in respect for the dignity of the individual and the capacity through reason for enlightened self-government. Law so grounded makes justice possible, for only through such law does the dignity of the individual attain respect

and protection. Without it, individual rights become subject to unrestrained power, respect for law is destroyed, and rational self-government is impossible.

Lawyers, as guardians of the law, play a vital role in the preservation of society. The fulfillment of this role requires an understanding by lawyers of their relationship with and function in our legal system. A consequent obligation of lawyers is to maintain the highest standards of ethical conduct.

Code of Professional Responsibility, Preamble. Ethical Consideration EC 1–1 of the Code of Professional Responsibility states that

[a] basic tenet of the professional responsibility of lawyers is that every person in our society should have ready access to the independent professional services of a lawyer of integrity and competence. Maintaining the integrity and improving the competence of the bar to meet the highest standards is the ethical responsibility of every lawyer.

Code of Professional Responsibility, EC 1–1. Thus the Code of Professional Responsibility articulates the public policy that citizens of the state should have access to professional legal services.[14] The nature of those services is further clarified by Ethical Consideration EC 2–1:

The need of members of the public for legal services is met only if they recognize their legal problems, appreciate the importance of seeking legal assistance, and are able to obtain the services of acceptable legal counsel. Hence, important functions of the legal profession are to educate laypersons to recognize their problems, to facilitate the process of intelligent selection of lawyers, and to assist in making legal services fully available.

interest in discharging an employee whose conduct giving rise to the termination or in the prosecution of litigation was disruptive to the conduct of business in the workplace.

**14.** Iowa was for some time the only state in which the Supreme Court enforced compliance with the Ethical Considerations of the Code of Professional Responsibility as well as the Disciplinary Rules, rather than finding the Ethical

Considerations to be merely aspirational. *Comm. on Professional Ethics & Conduct v. Patterson*, 369 N.W.2d 798, 800 (Iowa 1985). However, that position was altered with revisions to the Code as adopted by the Iowa Supreme Court. *Comm. on Professional Ethics & Conduct v. Carty*, 515 N.W.2d 32, 34 (Iowa 1994). The revision included a preamble which specifically states that the Ethical Considerations will now be treated as aspirational. *Id.*

Code of Professional Responsibility, EC 2–1. Thus, the Code of Professional Responsibility embodies a strong public policy favoring access of persons to professional legal services for the purposes of recognizing legal problems.[15] Among the duties of lawyers specifically articulated by the Iowa legislature is the duty "[t]o counsel or maintain no other actions, proceedings, or defenses than those which appear to the attorney or counselor legal and just...." Iowa Code § 602.10112(2). Thus, public policy favors protecting a person who consults an attorney concerning a dispute with another so that the person will be counseled to maintain a cause of action only if that action is legal and just.

Practically speaking, attorneys are the key to obtaining relief from violations of individual and group rights in employment and many other contexts. The United States Supreme Court has recognized that "[l]awyers in criminal cases 'are necessities, not luxuries.' Their presence is essential because they are the means through which the other rights of the person on trial are secured." *Michigan v. Harvey*, 494 U.S. 344, 357, 110 S.Ct. 1176, 1184, 108 L.Ed.2d 293 (1990) (citing *United States v. Cronic*, 466 U.S. 648, 653–54, 104 S.Ct. 2039, 2043–44, 80 L.Ed.2d 657 (1984)); *Penson v. Ohio*, 488 U.S. 75, 84, 109 S.Ct. 346, 352, 102 L.Ed.2d 300 (1988); *Gideon v. Wainwright*, 372 U.S. 335, 344, 83 S.Ct. 792, 796–97, 9 L.Ed.2d 799 (1963). Furthermore, the nature of the judicial system of this country, civil and criminal, itself makes consultation, and often employment, of legal representatives essential:

> [t]he paramount importance of vigorous representation follows from the nature of our adversarial system of justice. This system is premised on the well-tested principle that truth—as well as fairness—is "best discovered by powerful statements on both sides of the question.' "

*Penson*, 488 U.S. at 84, 109 S.Ct. at 352; *Cronic*, 466 U.S. at 655, 104 S.Ct. at 2044; Kaufmann, *Does the Judge Have A Right To Qualified Counsel?*, 61 A.B.A.J. 569, 569 (1975). The importance of consultation and employment of legal counsel to vindicate civil rights has also been recognized by federal statutory provisions awarding attorney fees for parties who succeed in vindicating those rights at trial:

> Congress expressly recognized that a plaintiff who obtains relief in a civil rights lawsuit " 'does so not for himself alone but also as a 'private attorney general,' vindicating a policy that Congress considered of the highest importance.' " House Report, at 2 (quoting *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402 [88 S.Ct. 964, 966, 19 L.Ed.2d 1263] (1968)). "If the citizen does not have the resources, his day in court is denied him; the congressional policy which he seeks to assert and vindicate goes unvindicated; and the entire Nation, not just the individual citizen, suffers." 122 Cong.Rec. 33313 (1976) (remarks of Sen. Tunney).

*City of Riverside v. Rivera*, 477 U.S. 561, 575, 106 S.Ct. 2686, 2694, 91 L.Ed.2d 466 (1986). Like federal civil rights legislation, the Iowa Civil Rights Act, Iowa Code Ch. 216, provides for attorney fees as part of the recovery of a successful litigant. Iowa Code § 216.15(8)(a)(8) (formerly § 601A.15(8)(a)(8)). These fee-shifting statutes legislate a simple truth: In today's complex legal system, lawyers play a critical role in vindicating important public and private rights.

Consultation with an attorney is a necessary first step in the process to discover whether an individual has a cognizable claim that will vindicate the rights of all citizens, or simply a claim for a wrong suffered by an individual, and the Iowa legislature has recognized the importance of an attorney to this determination by placing on attorneys the duty "[t]o counsel or maintain no other actions, proceedings, or defenses than those which appear to the attorney or counselor legal and just...." Iowa Code § 602.10112(2).

---

**15.** The appellate courts of Illinois have also used canons and opinions on professional ethics as providing guidance regarding public policy even if they were not directly declarative of public policy. *See, e.g., Marvin N. Benn & Assoc., Ltd. v. Nelsen Steel & Wire, Inc.*, 107 Ill.App.3d 442, 63 Ill.Dec. 251, 254, 437 N.E.2d 900, 903 (1982).

In light of the clear articulations of public policy favoring consultation with attorneys in order to determine whether a person has a legal problem, public policy favoring the availability of competent legal advice, public policy placing on lawyers a duty to counsel only actions that are legal and just, and public policy favoring compensation of legal counsel for individuals who endeavor to vindicate civil rights, the court concludes that acts that impede an individual from seeking legal advice would be "injurious to the public, or against the public good," would not be "right and just," and could potentially have a deleterious effect on "what affects the citizens of the State collectively." Such conduct would therefore be in violation of public policy. Even if the authorities cited above in support of the public policy did not exist, the court concludes that a consultation with a lawyer is so fundamental to our system of justice that an employer's discharge of an employee for consulting a lawyer would violate public policy. The court concludes that public policy protection extends to an at-will employee's statement of an intention to consult with an attorney concerning a dispute with an employer.

Also instructive is one court's conclusion that retaliation for consulting an attorney in order to pursue a discrimination claim should not be treated any differently from retaliation for actually filing a discrimination claim. *Rager v. Boise Cascade Corp.*, No. 88 C 1436, slip op. at 6, 1989 WL 31469, *4 (N.D.Ill. March 23, 1989) (Marvin E. Aspen, J.). The court remarked that

> [w]hether an employer terminates an employee for hiring an attorney to pursue a claim or waits until charges are formally made and a claim is actually filed, the employer is effectively attempting to deter or sabotage the employee's effort to enforce his right to nondiscriminatory treatment.

*Id.* The court found that the Illinois Human Rights Act evidenced Illinois's public policy to protect employees from such retaliatory actions. *Id.*

 The Iowa Code is replete with provisions that prohibit retaliation against an individual for taking actions to protect the indi-

vidual's own or the public's interests. *See, e.g.,* Iowa Code § 70A.29 ("no-retaliation" clause in public employee's "whistle-blower" act); Iowa Code § 91A.10 ("no-retaliation" clause for employee who seeks recovery of unpaid wages); Iowa Code § 135C.46 ("no-retaliation" clause in act regulating health care facilities); Iowa Code § 216.11 ("no-retaliation" clause for bringing civil rights claim); Iowa Code § 562A.36 ("no-retaliation" clause for complaints against landlord); Iowa Code § 562B.32 ("no-retaliation" clause for complaints against landlord of mobile home parks). The common-law action for wrongful or retaliatory discharge exists for the purpose of protecting an employee against retaliation when a statutory right is conferred but no statutory remedy is provided, or where the right is otherwise clearly articulated. *See, e.g., Borschel,* 512 N.W.2d at 567–68 (common-law wrongful discharge action will not lie if statute stating policy also provides for remedy, but will lie where statute does not provide remedy, or policy is found in constitution). If public policy is not violated by terminating an employee simply for threatening to consult an attorney to vindicate what the employee believes to be his or her rights against an employer, then an employer will be able effectively to deter or sabotage an employee's effort to enforce those rights. An employer's sabotage or intimidation of employees' efforts to enforce rights or expose wrong-doing is contrary to public policy.

 The court concludes that if Thompto can carry her burden of proof at trial that Coborn's terminated Thompto for threatening to consult an attorney, her termination would be in violation of public policy, and her action for wrongful discharge will lie. Coborn's is not entitled to summary judgment on Thompto's wrongful discharge claim. There is a triable issue for the jury to decide as to whether or not Thompto was in fact terminated for the reasons she has alleged or for legitimate business reasons stated by Coborn's. However, because the court is recognizing a new cause of action for retaliatory discharge in violation of public policy, punitive damages should not be awarded on this

claim even if Thompto prevails. *Lara,* 512 N.W.2d at 782; *Smith,* 464 N.W.2d at 687.[16]

## C. The Intentional Infliction Of Emotional Distress Claim

Coborn's has moved for summary judgment on Thompto's claim of emotional distress on the ground that none of the conduct by Coborn's Thompto has complained of is sufficiently outrageous as a matter of law to support the claim. The court ruled above that Iowa Code Ch. 216 provides the exclusive remedy for any conduct of Coborn's that is discriminatory. However, the court must now consider whether Thompto has alleged conduct for which Iowa Code Ch. 216 provides no remedy that is sufficiently outrageous to support a claim for intentional infliction of emotional distress.

### 1. Elements Of The Tort

The elements for recovery on the common law tort of intentional infliction of emotional distress in Iowa are:

(1) outrageous conduct by the defendant;

(2) the defendant's intentional causing, or reckless disregard of the probability of causing emotional distress;

(3) plaintiff suffered severe or extreme emotional distress;

(4) actual and proximate cause of the emotional distress by the defendant's conduct.

*Cutler v. Klass, Whicher & Mishne,* 473 N.W.2d 178, 183 (Iowa 1991) (citing *Vaughn,* 459 N.W.2d at 635–36, and *Vinson v. Linn–Mar Community Sch. Dist.,* 360 N.W.2d 108, 118 (Iowa 1984)). Coborn's has challenged the sufficiency of Thompto's complaint as a matter of law only on the ground that Thompto has not alleged sufficiently outrageous conduct, without addressing whether or not Thompto can make a sufficient showing of emotional distress.

### 2. The Outrageousness Of Defendant's Conduct

The Iowa Supreme Court has said that when a plaintiff brings a claim of intentional infliction of emotional distress, "it is for the court to determine in the first instance, as a matter of law, whether the conduct complained of may reasonably be regarded as outrageous." *Cutler v. Klass, Whicher & Mishne,* 473 N.W.2d 178, 183 (Iowa 1991); *Mills v. Guthrie County Rural Elec. Coop. Ass'n,* 454 N.W.2d 846, 849 (Iowa 1990); *M.H. by and through Callahan v. State,* 385 N.W.2d 533, 540 (Iowa 1986); *Reihmann v. Foerstner,* 375 N.W.2d 677, 681 (Iowa 1985); *Vinson v. Linn–Mar Community School Dist.,* 360 N.W.2d 108, 118 (Iowa 1984); *Roalson v. Chaney,* 334 N.W.2d 754, 756 (Iowa 1983). The Iowa Supreme Court has required an extreme of egregiousness to elevate (or downgrade) mere bad conduct to the level of outrageousness. *Northrup v. Farmland Indus., Inc.,* 372 N.W.2d 193, 198 (Iowa 1985). For conduct to be outrageous, it must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Cutler,* 473 N.W.2d at 183 (citing *Vaughn,* 459 N.W.2d at 636); *Engstrom v. State,* 461 N.W.2d 309, 320 (Iowa 1990) (quoting *Vinson,* 360 N.W.2d at 118); *Harsha v. State Sav. Bank,* 346 N.W.2d 791, 801 (Iowa 1984) (quoting Restatement (Second) of Torts § 46 comment d (1965)). Indeed, the Iowa court has said that

[t]he tort law should encourage a certain level of emotional toughness. "The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind." Restatement (Second) of Torts § 46, comment d, *supra.* "Against a large part of the frictions and irritations and clashing of temperaments incident to participation in a community life, a certain toughening of the mental hide is a better protection than the law

---

**16.** There is some ambiguity in Thompto's complaint as to whether she is seeking punitive damages on any or all of her common-law claims or only on her statutory claims.

could ever be." Magruder, Mental and Emotional Disturbance in the Law of Torts, 49 Harv.L.Rev. 1033, 1035 (1936). *Northrup*, 372 N.W.2d at 198–99 (quoting *Meyer v. Nottger*, 241 N.W.2d 911, 918 (Iowa 1976). Peculiar susceptibility, by reason of physical or mental condition of the person affected, is a factor in considering whether conduct is outrageous, although "major outrage" is always the crucial element of the tort. *Cutler*, 473 N.W.2d at 183 (quoting Restatement (Second) of Torts § 46, comment f). In *Northrup*, the court quoted extensively from the Restatement (Second) of Torts § 46, comment d, for a statement of the level of bad conduct necessary to be held to be outrageous:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.
>
> Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Northrup*, 372 N.W.2d at 198. Iowa courts have held, as the Restatement suggests, that it is not even sufficient that the conduct in question would have entitled the plaintiff to punitive damages. *Mills*, 454 N.W.2d at 850 (citing *Vinson*, 360 N.W.2d at 118).

It is a simpler matter to discover what kinds of behavior the Iowa Supreme Court has held insufficiently outrageous to sustain the tort than it is to find out what kind of behavior is sufficiently egregious. *See, e.g.*, *Cutler*, 473 N.W.2d at 183 (letter advising partner who had suffered from a period of mental illness that he could not return to law practice without further review by partners was not extremely outrageous and did not generate a genuine issue of material fact on the claim); *Engstrom*, 461 N.W.2d at 320 (negligent failure to search for plaintiffs' adopted daughter's natural father before placing her in plaintiffs' home, and telling adoptive parents the father was dead without verifying his death, were not outrageous); *Kirk v. Farm & City Ins. Co.*, 457 N.W.2d 906, 911 (Iowa 1990) (insurance company's refusal to pay the full amount of uninsured coverage not outrageous); *Mills*, 454 N.W.2d at 849 (rural electric cooperative's conduct in using split bolt connectors instead of compression connectors to connect grounding jumper wire to main neutral line, in failing to discover dangerous situation that such omission presented, and in conducting settlement negotiations through insurance carrier with cooperative customers who sustained fire damage was not sufficiently outrageous); *Tomash v. John Deere Indus. Equip. Co.*, 399 N.W.2d 387, 392–93 (Iowa 1987) (bringing of criminal charges was reasonably appropriate and therefore not outrageous); *Reihmann*, 375 N.W.2d at 681 (claim of improperly exerting influence to transfer employee was too speculative, and transfer of employee after complaints from customers was not outrageous); *Northrup*, 372 N.W.2d at 198–99 (firing for alcoholism not outrageous in light of extensive responsibilities of plaintiff); *Bossuyt v. Osage Farmers Nat'l Bank*, 360 N.W.2d 769, 777 (Iowa 1985) (bank's refusal to pay own cashier's check not outrageous); *Vinson*, 360 N.W.2d at 119 (deliberate campaign to badger and harass employee not outrageous although "petty and wrong, even malicious"); *Harsha v. State Sav. Bank*, 346 N.W.2d 791, 801 (Iowa 1984) (banker's refusal to extend credit causing creditor to default on other obligations not sufficiently outrageous to support jury verdict on emotional distress claim); *Roalson v. Chaney*, 334 N.W.2d 754, 756 (Iowa 1983) (offer to marry made to woman still married and intended for her was not outrageous conduct as to woman's husband, even if it showed poor judgment); *Action Real Estate Corp. v. Bulechek*, 309 N.W.2d 502, 505 (Iowa 1981) (refusal to pay commission on sale of land not outrageous); *Amsden v. Grinnell Mut. Reinsurance Co.*, 203 N.W.2d 252, 255 (Iowa 1972) (refusal to pay fire insurance benefits during

period of arson investigation to insured suspected of arson by authorities not outrageous). Few cases can be located where an Iowa court actually held the conduct alleged was sufficiently outrageous. *See, e.g., Blong v. Snyder,* 361 N.W.2d 312, 315–17 (Iowa App.1984) (supervisors' excessive and groundless harassment of employee sufficiently outrageous); *Randa v. U.S. Homes, Inc.,* 325 N.W.2d 905, 907–08 (Iowa App. 1982) (defective construction of home and filing of mechanic's lien so shocking as to support jury verdict for emotional distress).[17]

■■■ Notwithstanding the reluctance of Iowa courts to find conduct sufficiently outrageous to support a claim of intentional infliction of emotional distress, the court believes that such conduct is presented here. The court believes that recitation of the facts Thompto has alleged to an average member of the community would arouse his or her resentment against Coborn's, and lead the community member to exclaim, "Outrageous!" *Northrup,* 372 N.W.2d at 198. If Thompto can prove that she was terminated because she sought insurance benefits she believed had been promised her by her employer and for which deductions were made to her paycheck, or for threatening to "get a lawyer" to vindicate her right to insurance coverage, the court believes that an average member of the community would consider such conduct was worse than "petty and malicious" because it could be perceived to be calculated to intimidate Thompto and other employees into foregoing benefits for which they believed they had paid. Coborn's is not entitled to summary judgment on Thompto's claim of intentional infliction of emotional distress on the ground that Thompto has failed to allege conduct that is sufficiently outrageous as a matter of law.

### 3. Sufficiency Of Plaintiff's Emotional Distress

Coborn's has not moved for summary judgment on Thompto's claim of intentional infliction of emotional distress on the ground that Thompto cannot show sufficient evidence of emotional distress, and therefore the court need not consider here whether Thompto can make a sufficient showing. The court has articulated the applicable standards for a showing of emotional distress in support of this tort elsewhere.[18] Suffice it to say that Thompto must meet the stringent requirements for showing emotional distress imposed by the Iowa Supreme Court in order to prevail on her tort claim at trial.

### D. The Defamation Claim

Coborn's has moved for summary judgment on Thompto's defamation claim on the ground that it had a qualified privilege to communicate the allegedly defamatory statements. Thompto asserts that Coborn's had no such privilege because it cannot show that the statements were made in good faith, and, Thompto argues, Coborn's made the statements with actual malice.

### 1. Defamation And Defamation "Per Se"

■■■ The law of defamation consists of the twin torts of libel and slander, and the gist of a defamation action is the publication of written or oral statements which tend to injure a person's reputation and good name. *Lara,* 512 N.W.2d at 785 (citing W. Page Keeton, *Prosser and Keeton on the Law of Torts* § 111, 15 771 (5th ed. 1984)). Slander generally consists of the oral publication of defamatory matter. *Id.* Libel in Iowa is the "malicious publication, expressed either in printing or in writing, or by signs and pictures, tending to injure the reputation of

---

**17.** Thompto cites the case of *Brown v. Garman,* 364 N.W.2d 566 (Iowa 1985), as a case in which the court found conduct by a union inhibiting a member's ability to find a job sufficiently outrageous. That, however, was not the holding of the case. Rather, the court held that the trial court improperly ruled that the plaintiff's claim of intentional infliction of emotional distress was preempted by federal labor law. *Garman,* 364 N.W.2d at 570. The court remanded the case to the trial court for a determination of whether or not the conduct alleged was sufficiently outrageous, an issue not reached at trial or on appeal. *Id.* at 570–71.

**18.** *See, e.g., Rouse v. Farmers State Bank Of Jewell, Iowa,* 866 F.Supp. 1191 (N.D.Ia.1994); *Chester v. Northwest Iowa Youth Emergency Services Center,* 869 F.Supp. 700, (N.D.Ia.1994).

another person or to expose [the person] to public hatred, contempt, or ridicule or to injure [the person] in the maintenance of [the person's] business." *Vinson v. Linn–Mar Community School Dist.*, 360 N.W.2d 108, 115 (Iowa 1984). Thompto's allegations here appear to be primarily assertions of libel, but may also include alleged slander by oral statements of Coborn's employees to civil rights investigators or others.

Where there is no communication to the general public, but instead the statements are made only to the plaintiff, and the plaintiff disseminates the statements, there is no defamation. *McBride v. City of Sioux City*, 444 N.W.2d 85, 92 (Iowa 1989); *Belcher v. Little*, 315 N.W.2d 734, 738 (Iowa 1982). The plaintiff cannot create a cause of action by communicating defamatory statements to others unless under a strong compulsion to do so. *Belcher*, 315 N.W.2d at 738. Whether such compulsion exists must be decided by the finder of fact under the circumstances in each case and must be based on the introduction of substantial evidence. *Id.*

In order to prevail on a defamation claim, a plaintiff must ordinarily prove that the statements were made with malice, were false, and caused damage. *Vinson*, 360 N.W.2d at 115 (citing *Vojak v. Jensen*, 161 N.W.2d 100, 104 (Iowa 1968)). However, some statements, in a special category of slander or libel "per se," are actionable without proof of malice, falsity, or special harm. *Lara*, 512 N.W.2d at 785; *Vinson*, 360 N.W.2d at 115–116; *Kelly v. Iowa State Educ. Ass'n*, 372 N.W.2d 288, 295 (Iowa App. 1985). Words are defamatory per se if they are of such a nature, whether true or not, that the court can presume as a matter of law that their publication will have defamatory effect. *Vinson*, 360 N.W.2d at 116 (citing *Haas v. Evening Democrat Co.*, 252 Iowa 517, 107 N.W.2d 444, 447 (1961)). Among such statements are defamatory imputations affecting a person in his or her business, trade, profession, or office. *Lara*, 512 N.W.2d at 785; *Vojak v. Jensen*, 161 N.W.2d 100, 104 (Iowa 1968); *Galloway v. Zuckert*, 447 N.W.2d 553, 554 (Iowa App.1989).

### 2. Qualified Privilege

Although Thompto has alleged defamation per se, because the allegedly defamatory statements concerned her job performance, the law recognizes that circumstances may arise when a person, in order to protect his or her own interest or the interest of others, must make statements about another which are defamatory or defamatory per se, and in such circumstances a qualified privilege bars liability. *Vojak*, 161 N.W.2d at 104; *Higgins v. Gordon Jewelry Corp.*, 433 N.W.2d 306, 308 (Iowa App.1988). Coborn's may raise qualified privilege as a defense if it can show that it made the allegedly defamatory statements in the proper circumstances:

> A qualified privilege applies to statements without regard to whether they are defamatory per se when they are made on an appropriate occasion in good faith on a subject in which the communicator and addressee have a shared interest, right or duty.

*Vinson*, 360 N.W.2d at 116; *see also Fischer v. UNIPAC Serv. Corp.*, 519 N.W.2d 793, 795 (Iowa 1994); *Lara*, 512 N.W.2d at 785. The statements must be made "in a manner and under circumstances fairly warranted by the occasion." *Lara*, 512 N.W.2d at 785; *Knudsen v. Chicago & North Western Transp. Co.*, 464 N.W.2d 439, 442 (Iowa 1990); *Rees v. O'Malley*, 461 N.W.2d 833, 837 (Iowa 1990).

The privilege must not be abused or exceeded. *Lara*, 512 N.W.2d at 786. Therefore, the privilege is lost if the statements are not made in good faith, *Lara*, 512 N.W.2d at 786, *Haldeman v. Total Petroleum, Inc.*, 376 N.W.2d 98, 104 (Iowa 1985), or are made with actual malice. *Knudsen*, 464 N.W.2d at 443; *Vinson*, 360 N.W.2d at 116. So long as good faith is present,

> the person making the statement is not limited to facts that are within his personal knowledge, but may, and should, pass on to his inquirer all relevant information that has come to him, regardless of whether he believes it to be true or not. But of course, any such communication is actionable if made maliciously.

*Haldeman*, 376 N.W.2d at 104 (quoting 50 Am.Jur.2d *Libel & Slander* § 273, at 791). As distinct from legal malice and from actual

malice under *New York Times Co. v. Sulli-van,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964),[19] actual malice in this context does depend on the motive for the statement. Actual malice requires proof that the statement was made with malice in fact, ill-will or wrongful motive. *Id.* at 103–04 (citing *Vinson,* 360 N.W.2d at 117); *Benishek v. Cody,* 441 N.W.2d 399, 403 (Iowa App.1989). In the absence of actual malice, the qualified privilege extends even to statements that are not true. *Vojak,* 161 N.W.2d at 105; *Benishek,* 441 N.W.2d at 402 (citing *Vojak* ). The privilege does not extend to publication to the general public. *Rees,* 461 N.W.2d at 837 (citing *Brown v. First Nat'l Bank of Mason City,* 193 N.W.2d 547, 552 (Iowa 1972)).

■ In summary, the elements of the qualified privilege defense are that: (1) the statements were made in good faith; (2) the defendant had an interest to be upheld; (3) the statements were limited in their scope to this purpose; (4) the statements were made on a proper occasion; and (5) publication was in a proper manner and to proper parties only. *Knudsen,* 464 N.W.2d at 439 (citing *Brown v. First Nat'l Bank of Mason City,* 193 N.W.2d 547, 552 (Iowa 1972)).

■ Ordinarily, it is for the court to decide whether the privilege is available for the communication in question. *Brown v. First Nat'l Bank of Mason City,* 193 N.W.2d 547 (Iowa 1972); *Higgins,* 433 N.W.2d at 308; Restatement (Second) of Torts § 619(1), p. 316 (1977). The burden is on the defendant to establish the existence of a qualified privilege. *Lara,* 512 N.W.2d at 785; *Rees,* 461 N.W.2d at 837. Qualified privilege is an affirmative defense that must be pleaded.

*Vinson,* 360 N.W.2d at 116; *Higgins,* 433 N.W.2d at 311 (quoting *Vinson*). *See also Spencer v. Spencer,* 479 N.W.2d 293, 296 (Iowa 1991) (qualified privilege one of "affirmative defenses" to defamation on which court properly instructed jury), *cert. denied,* —— U.S. ——, 113 S.Ct. 120, 121 L.Ed.2d 76 (1992).

■ In the present case, the court concludes that Coborn's has established a qualified privilege to make the statements Thompto alleges to be defamatory. Coborn's pleaded the affirmative defense of qualified privilege as required by *Vinson* in its first amended answer, filed September 23, 1994. The undisputed facts establish Coborn's entitlement to that privilege. Coborn's employees only communicated the allegedly defamatory statements only in appropriate circumstances when under a duty to do so and only to persons with a shared interest in those communications. Coborn's was required to cooperate with Job Service and civil rights investigators in establishing the basis for its termination of Thompto. It provided its records on the matter, and further made available its personnel with information about or responsible for the decision to terminate Thompto. Coborn's did not affirmatively set out to communicate negative job evaluations to any of Thompto's prospective employees as did the defendant in *Lara. Lara,* 512 N.W.2d at 786. All of Coborn's communications were maintained within the circle of persons with a shared interest in those communications.

Thompto asserts that Coborn's is not entitled to any qualified privilege in this matter because Coborn's conveyed information to the civil rights investigators that Thompto

---

**19.** Under the constitutional standards established in *New York Times,* "actual malice" must be shown before a private figure plaintiff may recover punitive damages, *In re IBP Confidential Bus. Documents Litigation: Bagley v. Iowa Beef Processors, Inc.,* 797 F.2d 632, 647 (8th Cir.1986) (citing *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 775, 106 S.Ct. 1558, 1563, 89 L.Ed.2d 783 (1986)), *cert. denied,* 479 U.S. 1088, 107 S.Ct. 1293, 94 L.Ed.2d 150 (1987), and before a public figure plaintiff may recover any damages. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 335–36, 94 S.Ct. 2997, 3005, 41 L.Ed.2d 789 (1974). "Malice" under *New York Times*

does not refer to ill will. *Price v. Viking Penguin, Inc.,* 881 F.2d 1426, 1433 (8th Cir.1989), *cert. denied,* 493 U.S. 1036, 110 S.Ct. 757, 107 L.Ed.2d 774 (1990). The primary focus must be on the defendant's attitude toward the truth of the statements, rather than on the defendant's attitude toward the plaintiff. *Id.* A statement is made with "actual malice" if it is made "with knowledge that it was false or with reckless disregard of whether it was false or not." *Bagley,* 797 F.2d at 643 (citing *New York Times,* 376 U.S. at 279–80, 84 S.Ct. at 726). Actual malice in this context must be established by clear and convincing evidence. *Id.*

asserts was demonstrably false. The court concludes first that Thompto has failed to establish that any demonstrably false information was conveyed to those investigators. Thompto suggests that Landowski's deposition testimony that the labor cost targets shown in plaintiff's Exhibit C were not accurate establishes demonstrable falsity of Meyer's reports to the Mason City Human Rights Commission that Thompto failed to meet those targets. However, it is undisputed from the record that Thompto failed to meet the labor cost targets of 30% that Landowski testified he believed were the actual targets. Landowski's testimony, in the court's opinion, was not so categorical as Thompto suggests that the labor cost targets shown in Exhibit C were wrong. Rather, he testified that he told Thompto her labor cost target for the fourth quarter of 1991 was 30%, and in deposition he added that, "[w]e fully expected her to be able to get back to 30 percent which we still thought was high but based upon her performance it would be a dramatic improvement over what had been happening in that department." Deposition of Bill Landowski, at p. 75, line 8–11. Thompto has failed to generate any evidence other than her conclusory assertions that any of the other factual matters Meyer presented to investigators concerning Thompto's performance were demonstrably untrue.

Second, the court notes that so long as good faith is present, the person making a statement covered by a qualified privilege "is not limited to facts that are within his personal knowledge, but may, and should, pass on to his inquirer all relevant information that has come to him, regardless of whether he believes it to be true or not." *Haldeman*, 376 N.W.2d at 104 (quoting 50 Am.Jur.2d *Libel & Slander* § 273, at 791). The court believes that Coborn's passed on to interested parties only relevant information concerning Thompto's performance, and that Coborn's employees believed that information to be true.

Thompto makes two further attacks on Coborn's assertion of a qualified privilege in this case. First, Thompto asserts that Coborn's did not make any statements that might otherwise be qualifiedly privileged with the required "good faith." Second, Thompto asserts that Coborn's made the statements with actual malice. Thompto asserts that Coborn's claim of good faith is "beyond belief" because she asserts that Coborn's terminated her for claiming a right to cancer insurance and threatening to get an attorney to pursue that claim, "then fabricated substandard performance" as an excuse to fire her. Plaintiff's Memorandum of Law In Opposition To Defendant's Motion For Partial Summary Judgment, p. 10 (hereinafter "Plaintiff's Brief"). However, the court finds that the undisputed facts demonstrate that Thompto's performance was below the targets set, and that Thompto had notice of Coborn's concerns about her performance from the October evaluation and the scheduling of a reevaluation for January, as well as on-going contact with Landowski concerning her failure to meet targets. There is sufficient basis in the record for the court to conclude that Coborn's communications concerning Thompto's performance were in good faith and not fabricated.

Thompto also asserts that Coborn's attempt to support its statements concerning her performance to civil rights investigators with "falsified documents" clearly constitutes ill will and actual malice. The allegation of falsified documents is also based on the assertion that Exhibit C does not contain the correct labor cost targets. The court has already concluded that there is no categorical statement by Landowski to support an assertion that Exhibit C is untrue. Therefore, there is also no basis for asserting that it is falsified. Rather, Landowski's testimony was that Thompto's labor cost targets were varied from those shown in Exhibit C because Coborn's believed that meeting an adjusted target would be a drastic improvement in Thompto's performance. Thompto did not meet either the adjusted target or the original target for labor costs. There is no other support in the record for an assertion of actual malice sufficient to deny Coborn's claim of a qualified privilege in this case.

### 3. Self–Publication And Qualified Privilege

█ Finally, Thompto asserts that even if Coborn's had a qualified privilege to commu-

nicate its allegedly defamatory statements to governmental agencies and civil rights investigators, that she has nonetheless been defamed because she has been compelled to repeat Coborn's defamatory statements to prospective employers. Coborn's asserts that it is entitled to summary judgment on Thompto's defamation claim on the ground that Thompto's self-publication of allegedly defamatory statements does not create a cause of action, citing *Belcher*, 315 N.W.2d at 738.

The court does not read *Belcher* as standing for the broad proposition for which Coborn's has asserted it. Coborn's is correct in arguing that where there is no communication to the general public, but instead the statements are made only to the plaintiff, and the plaintiff disseminates the statements, there is no defamation. *McBride v. City of Sioux City*, 444 N.W.2d 85, 92 (Iowa 1989); *Belcher v. Little*, 315 N.W.2d 734, 738 (Iowa 1982). However, *Belcher* creates an exception to this rule where the plaintiff is under a strong compulsion to communicate defamatory statements to others. *Belcher*, 315 N.W.2d at 738. Whether such compulsion exists must be decided by the finder of fact under the circumstances in each case and must be based on the introduction of substantial evidence. *Id.* The court in *Belcher* remanded the case for trial of the plaintiff's claim of defamation by self-publication with instructions that

> the jury should be told to find a publication or absence thereof based on the disclosure of the defamation by the [plaintiffs] to [the public]; whether [the plaintiffs] were under strong compulsion to make such disclosure; and whether [defendant] should have reasonably anticipated such disclosure would be made.

*Belcher*, 315 N.W.2d at 738.

In the present case, the record demonstrates that there is at least a material issue of fact as to whether Thompto made publication of the defamatory statements to the public, in this case prospective employers. There is plainly a genuine issue of material fact as to whether or not she was under a strong compulsion to make those disclosures and whether Coborn's should reasonably have anticipated such disclosures would be made. It would therefore ordinarily be for the jury to decide whether such a strong compulsion existed in this case. However, the court concludes that Coborn's qualified privilege extends even to Thompto's self-publication even if it was the result of a strong compulsion.

Thompto has cited no authority, and the court has found none, for the proposition that a qualified privilege does not extend to self-publication of statements originally covered by the privilege. The court concludes that defendants have a valid defense of qualified privilege in the circumstances here. The defendants only repeated the allegations that Thompto's performance had been inadequate within the appropriate managerial sphere of Coborn's and to civil rights investigators. The defendants had an interest in Thompto's job performance, and communicated that concern only to others with a shared interest "in a manner and under circumstances fairly warranted by the occasion." *Lara*, 512 N.W.2d at 785; *Knudsen*, 464 N.W.2d at 442; *Rees*, 461 N.W.2d at 837. The court believes that to limit the qualified privilege only to communications made by defendants themselves, but to strip it away from communications self-published by the claimant, even if the claimant is under a strong compulsion to do so, would create an insupportable conundrum of holding defendants liable for statements qualified in one context but not in a context that has nothing to do with the defendants' conduct. Such a limit on the qualified privilege would make it nearly impossible for a defendant to make the legitimate business decision to terminate an employee for poor performance, properly document that decision for the purposes of a civil rights investigation, but still avoid tort liability for defamation because the discharged employee is or feels compelled to make some explanation of his or her termination to prospective employees. The law recognizes that circumstances may arise when a person, in order to protect his or her own interest or the interest of others, must make statements about another which are defamatory or defamatory per se, and in such circumstances a qualified privilege bars liability. *Vojak*, 161 N.W.2d at

104; *Higgins v. Gordon Jewelry Corp.*, 433 N.W.2d 306, 308 (Iowa App.1988). Any allegations of defamation here fall within the shelter of a valid qualified privilege. Summary judgment in favor of defendants is therefore appropriate on Thompto's defamation claim.

### V. CONCLUSION

The court concludes that Coborn's motion for partial summary judgment must be granted only in part. The court confirms the parties' agreement to dispose of all or parts of certain claims by granting summary judgment in Coborn's favor as follows: (1) summary judgment is granted on the entirety of Thompto's claim in Count IV, the ERISA claim; (2) summary judgment is granted on Counts I (Title VII) and II (Iowa Code § 216.6) to the extent that such claims are based on age discrimination, and additionally, Count II shall be withdrawn from jury consideration and will instead be tried to the bench; (3) summary judgment is further granted on Count II on any damages claims for "inconvenience" or "loss of enjoyment of life"; (4) summary judgment is granted on Counts III, V, VI, and VII of the complaint on any claims for "back pay," "inconvenience," "loss of enjoyment of life," or attorney fees. These claims or parts of claims are dismissed.

Coborn's is also entitled to summary judgment in its favor on any part of Thompto's claims of wrongful discharge or intentional infliction of emotional distress that are based on allegations of sexual discrimination for which Thompto's claim under the Iowa Civil Rights Act, Iowa Code Ch. 216, provides the exclusive remedy. Any claims under Counts V and VII that are based on allegations of sexual discrimination are therefore dismissed.

Coborn's is also entitled to summary judgment in its favor on Thompto's claim of defamation in Count VII of her complaint. Coborn's has asserted a valid claim of qualified privilege to make the allegedly defamatory statements only to interested parties and did so limit communication of its statements. Furthermore, the court concludes that there is no evidence of a lack of good faith or actual malice on the part of Coborn's such that Coborn's claim of qualified privilege should be denied. Thompto's defamation claim must therefore be dismissed.

However, Coborn's is not entitled to summary judgment on the remaining grounds it has raised here. The court concludes that Thompto's claim of wrongful or retaliatory discharge will lie because the court finds that clearly articulated public policy of the state of Iowa creates an exception to the at-will employment doctrine in circumstances were an employee has allegedly been discharged for inquiring about insurance coverage to which she believed she was entitled and requesting an explanation of why those benefits were not available, and for threatening to consult a lawyer concerning efforts to obtain that coverage or an explanation. However, no punitive damages, if sought, shall be awarded on this claim if Thompto prevails at trial, because the court is recognizing a new cause of action for retaliatory discharge in violation of public policy. The conduct on the part of an employer alleged as the basis for the wrongful discharge claim is also sufficiently outrageous as a matter of law to support a claim of intentional infliction of emotional distress.

**IT IS SO ORDERED.**